2016 COA 13M

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Man Hao LUONG, Defendant–Appellant.**

**Court of Appeals No. 13CA1727**

Colorado Court of Appeals,
Div. VI.

Announced February 11, 2016

As Modified on Denial of Rehearing
March 24, 2016

844

Cynthia H. Coffman, Attorney General, Molly E. McNab, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Springer and Steinberg, P.C., Andrew B. Reid, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE NAVARRO

¶1 Defendant, Man Hao Luong, appeals the district court's order denying his Crim. P. 35(c) motion without a hearing. In his motion, Luong alleged that his trial counsel had provided ineffective assistance because counsel did not investigate whether Luong had been denied his Sixth Amendment right to a jury selected from a representative cross-section of the community. He thus presents an alleged violation of the Sixth Amendment's fair cross-section guarantee in the context of an ineffective assistance of counsel claim—an unusual posture that no reported Colorado decision has addressed. Because Luong's allegations did not show that his counsel's performance was deficient under the circumstances, we affirm the denial of the postconviction motion.

## I. Background

¶2 Based on acts committed in 2005, Luong was charged with six counts of aggravated robbery; two counts each of second degree kidnapping and first degree burglary; one count each of robbery of an at-risk adult, second degree assault, and theft; and conspiracy to commit multiple offenses. He was also charged with twelve crime of violence sentence enhancers. A jury found Luong guilty of all counts. The trial court sentenced him to ninety-six years in prison.

¶ 3 On direct appeal, a division of this court affirmed in part, reversed in part, and vacated in part the judgment. *People v. Luong*, (Colo.App. No. 07CA1604, 2011 WL 3612282, Oct. 13, 2011) (not published pursuant to C.A.R. 35(f)). As a result, Luong was resentenced to sixty-four years in prison.

¶ 4 Luong then filed a Crim. P. 35(c) motion for postconviction relief. He alleged that he had received ineffective assistance from his trial counsel because counsel did not investigate whether jurors of Asian ethnicity were systematically or intentionally underrepresented in the 100–person venire from which his jury was selected as well as from other juries in the county over an extended period of time. Relatedly, Luong asserted that the State's destruction of records of the relevant master jury list (also known as the "jury wheel") and jury panel violated his constitutional rights because the purported destruction prevented him from proving that his counsel's performance had prejudiced him.[1] The district court denied the motion.

¶ 5 After Luong filed his notice of appeal, the state court administrator informed him that the records of the jury wheel and jury panel (sometimes called the "jury pool") for the relevant date had been found. At Luong's request, the administrator in 2014 provided a list of the 324 people who appeared for jury service in Jefferson County on the day of Luong's trial. That list is in the appellate record even though it was not before the postconviction court. Luong moved to remand for consideration of the new information, and his motion was referred to this division. For the reasons set forth below, we deny the motion to remand.

## II. Summary Denial of the Postconviction Motion

¶ 6 Luong contends that the postconviction court erred by denying his Crim. P. 35(c) motion without an evidentiary hearing. We do not agree.

### A. Standard of Review

¶ 7 We review de novo a district court's summary denial of a Crim. P. 35(c) motion. *People v. Aguilar*, 2012 COA 181, ¶ 6, 317 P.3d 1255.

### B. Applicable Law

¶ 8 A defendant is entitled to a hearing on a Crim. P. 35(c) motion if he asserts specific facts that, if true, would provide a basis for relief. *White v. Denver Dist. Court*, 766 P.2d 632, 635 (Colo. 1988). A district court may deny the motion without a hearing if the claim raises only an issue of law or if the allegations, even if true, do not provide a basis for relief. *People v. Venzor*, 121 P.3d 260, 262 (Colo. App. 2005). A court may also deny, without a hearing, a postconviction motion alleging deficient performance of counsel if the allegations are "merely conclusory, vague, or lacking in detail." *People v. Osorio*, 170 P.3d 796, 799 (Colo. App. 2007).

¶ 9 A criminal defendant is constitutionally entitled to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003). To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in *Strickland*. First, a defendant must demonstrate that counsel's acts or omissions "fell outside the range of professionally competent assistance[.]" *People v. Rodriguez*, 914 P.2d 230, 294 (Colo. 1996). Second, a defendant must show that he or she suffered prejudice as a result of counsel's deficient performance, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Because a defendant must show both deficient performance and prejudice, a court may resolve an ineffective assistance claim solely on the basis that the defendant

---

1. The state court administrator creates "master lists of prospective jurors, called jury wheels, for every county in the state. Each week, the counties randomly select a group of prospective jurors from their jury wheel to form the jury panel for that week's trials." *Washington v. People*, 186 P.3d 594, 597 (Colo. 2008).

has failed in either regard. *People v. Vieyra,* 169 P.3d 205, 209 (Colo. App. 2007).

¶ 10 The Sixth Amendment right to an impartial jury guarantees a defendant the right to a jury selected from a representative cross-section of the community. *People v. Sepeda,* 196 Colo. 13, 18, 581 P.2d 723, 727 (1978). A defendant is not entitled, however, to a "jury of any particular composition." *Washington v. People,* 186 P.3d 594, 600 (Colo. 2008) (quoting *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). The constitutional guarantee requires only that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (quoting *Taylor,* 419 U.S. at 538, 95 S.Ct. 692).

¶ 11 To establish that the composition of a jury pool is a prima facie violation of the Sixth Amendment's fair cross-section guarantee, a defendant must prove that (1) the group alleged to be excluded is a distinctive group; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Washington,* 186 P.3d at 600–01. The systematic exclusion must have "occurred not just occasionally but in every weekly venire for a period [of time]." *Washington,* 186 P.3d at 601 (quoting *Duren,* 439 U.S. at 366, 99 S.Ct. 664).

¶ 12 A defendant may establish a violation of the Equal Protection Clause by demonstrating that (1) "the venire was selected under a practice providing the opportunity for discrimination" and (2) "members of a cognizable racial group were substantially underrepresented on the venire[.]" *People v. Cerrone,* 854 P.2d 178, 188 (Colo. 1993). In this context, a defendant must prove that intentional discrimination caused underrepresentation of a racial group on the venire. *Id.*

## C. Trial Counsel's Performance

¶ 13 Luong contends that his trial counsel provided ineffective assistance because counsel failed to investigate whether Asian-Americans were systematically or intentionally underrepresented in the jury wheel, the relevant jury pool, and the venire for his trial. Specifically, Luong contends that the absence of Asian–Americans on the 100–person venire selected for his trial required his counsel to investigate the matter further, given that Asian–Americans represented 2.63% of Jefferson County's population.

¶ 14 Initially, we agree with Luong that his counsel's duty to provide effective assistance (including the duty to investigate) did not end when the trial began. This duty extended to jury voir dire and throughout the trial. *See Hutchinson v. People,* 742 P.2d 875, 881 (Colo. 1987) ("[C]ounsel has a duty to make reasonable investigations in connection with the case or to make a reasonable decision that makes particular investigations unnecessary."); *Ervin v. State,* 423 S.W.3d 789, 793 (Mo. Ct. App. 2013) ("A trial attorney has a duty to investigate all aspects of a defendant's case.").

¶ 15 Viewing Luong's allegations through the lens of *Strickland,* the question for us is not whether he could possibly prove a fair cross-section claim or equal protection violation. Rather, the question is whether it was outside the bounds of reasonable professional assistance for his trial counsel not to assert or investigate such claims given what counsel knew at the time. *See Rodriguez,* 914 P.2d at 294 (recognizing that a "fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time") (citation omitted).

¶ 16 In reviewing counsel's performance, we must be "highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. "A particular decision not to investigate must be directly assessed for reason-

ableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. 2052.

### 1. No Allegation That Trial Counsel Knew the Asian Population of the County

¶ 17 For purposes of our analysis, we accept as true the factual allegations made in Luong's Crim. P. 35(c) motion. Luong asserted that he is Asian and has an Asian appearance. He also alleged that no people with Asian surnames or who were otherwise identifiable as Asian appeared in the 100–person venire from which his trial jury was selected.[2] Finally, Luong alleged that 2.63% of Jefferson County's population self-identified as Asian in the 2010 Census.[3]

¶ 18 According to the People, Luong's allegation about the absence of jurors with Asian surnames fails to recognize that not all jurors who self-identify as Asian have Asian surnames. We take this point. Surnames aside, however, Luong also alleged that no jurors who were otherwise identifiable as Asian appeared in the jury pool. In combination, therefore, he alleged that no Asian-Americans appeared in the jury pool. We must accept this allegation as true for purposes of our analysis.

¶ 19 The premise of Luong's claim is that at least two Asian-Americans should have appeared in the 100–person venire in light of the county's Asian population. Therefore, he maintains that the absence of Asian-Americans raised a red flag. Of import, however, Luong did *not* allege that his trial counsel knew or should have known that the Asian population of Jefferson County was 2.63%, such that counsel should have expected at least two Asian-Americans in the venire.

¶ 20 Without specific allegations about what trial counsel knew or should have known about the Asian population of Jefferson County, we cannot assume that counsel was aware of the actual percentage and, thus, should have been surprised by a 100–person venire without Asian-Americans. On the contrary, in applying the presumption that counsel's conduct was reasonable, courts are "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . . counsel may have had for proceeding as they did." *Cullen v. Pinholster,* 563 U.S. 170, 196, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (citation omitted).

¶ 21 If, for instance, Luong's trial counsel had believed the percentage of Asian-Americans was less than 2%, or indeed less than 1%, counsel would not have been surprised to see fewer than two, or indeed zero, Asian-Americans in the 100–person venire. Such a belief would not have been objectively unreasonable given the actual, very low percentage of Asian-Americans in Jefferson County and given that some other racial minorities comprised less than 1% or close to 1% of the overwhelmingly white county. *Cf. Harrington v. Richter,* 562 U.S. 86, 110, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").[4]

¶ 22 Accordingly, accepting Luong's factual allegations as true, we do not conclude that his trial counsel's performance amounted to "gross incompetence." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). A hearing was thus unnecessary.

2. We do not consider the list of 324 jurors supplied by the state court administrator in 2014 because that list was not known to trial counsel in 2007.

3. Luong did not cite data concerning the Asian population at the time of his trial in 2007. "We may properly take judicial notice of United States Census Bureau data[.]" *United States v. Dreyer,* 767 F.3d 826, 834 n.12 (9th Cir. 2014). According to the Census Bureau, 2.3% of Jefferson County's population was Asian in 2000. *See* https://perma.cc/D9AS–XGCE.

4. African-Americans and American Indians and Alaska Natives were each less than 1% of Jefferson County's population in 2000. *See* https://perma.cc/D9AS–XGCE. By 2010, the African-American population had risen to 1.1%, but the American Indian and Alaska Native population remained less than 1%. *See* https://perma.cc/GL 2D–LEVE. Whites comprised over 90% of the county's population in 2000 and over 88% in 2010. *See* https://perma.cc/GL2D-LEVE;https:// perma.cc/D9AS–XGCE.

### 2. Performance Not Deficient Even if Trial Counsel Knew the Asian Population of the County

¶ 23 Alternatively, even assuming that Luong's trial counsel knew or should have known the Asian population of Jefferson County, counsel's performance was not deficient given the information allegedly apparent to counsel at the time (i.e., there were no Asian–Americans in the 100–person venire). Luong contends that, under applicable constitutional law, this information indicated a prima facie case of significant underrepresentation of Asian–Americans in the venire and, thus, required his counsel to investigate such a claim. We consider that case law and the statistical analyses used therein.

¶ 24 Our supreme court has explained that there are four ways to measure whether the underrepresentation of a distinctive group resulted in jury panels that failed to reasonably represent the community: (1) absolute disparity; (2) comparative disparity; (3) absolute impact; and (4) statistical significance. *Washington,* 186 P.3d at 602–03. Absolute disparity measures the difference between "the group's percentage in the community's population and the group's percentage on the community's jury panels." *Id.* at 602. Comparative disparity is a group's absolute disparity divided by its percentage in the community and then multiplied by 100 to create a figure expressed as a percentage. *Id.* Absolute impact measures the decrease in the number of group members on an average jury panel and is calculated by multiplying the absolute disparity by the number of prospective jurors on the jury panel in question. *Id.* Statistical significance, which depends heavily on the size of the jury pools and is used by applying a binomial distribution, measures the likelihood that the underrepresentation of a particular group occurred by chance. *Id.* at 603.

¶ 25 "[N]o specific statistical measure should be excluded in a court's analysis of a constitutional fair cross-section claim, and ... a court should evaluate all the statistical evidence presented to determine whether the alleged underrepresentation is unfair and unreasonable[.]" *Id.* at 605. But our supreme court has also recognized the short-

comings of both absolute and comparative disparity when dealing with small group populations. *Id.* at 603–04. Absolute disparity tends to understate a small group's underrepresentation on jury panels, while comparative disparity tends to overstate it. *Id.*

¶ 26 "Although the equal protection and fair cross-section standards may be different, there is 'no rationale for applying different measures of underrepresentation in the fair cross-section and equal protection contexts that can survive close scrutiny.'" *Id.* at 602 n. 7 (citation omitted). Therefore, our supreme court's discussion of the pertinent statistical measures of underrepresentation applies to both types of claims. *See id.*

¶ 27 Accepting Luong's assertions about the composition of the 100–person venire, the absolute disparity was 2.63% because the percentage of Asian–Americans in Jefferson County was allegedly 2.63% and the number in the venire was zero. *See id.* at 602. "Courts generally are reluctant to find that the second element of a prima facie Sixth Amendment case has been satisfied when the absolute disparities are less than 10%." *United States v. Shinault,* 147 F.3d 1266, 1273 (10th Cir. 1998). And in *Sepeda,* 196 Colo. at 20, 581 P.2d at 728, our supreme court declined to find a violation based on an absolute disparity of 5%.

¶ 28 Moreover, the absolute disparity here was far less than the percentages in cases in which the United States Supreme Court has found a violation of the fair cross-section requirement. *See Duren,* 439 U.S. at 367 n.25, 99 S.Ct. 664 (39% absolute disparity); *Castaneda v. Partida,* 430 U.S. 482, 495–96, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (40% absolute disparity); *see also United States v. Gault,* 141 F.3d 1399, 1402–03 (10th Cir. 1998) (no constitutional violation for a 7% absolute disparity); *United States v. Yazzie,* 660 F.2d 422, 427 & n. 4 (10th Cir. 1981) (no constitutional violation for a 4.29% absolute disparity). Thus, although we recognize that absolute disparity analysis is imperfect in the case of small groups (such as the Asian population of Jefferson County), the absolute disparity of 2.63% here did not suggest substan-

tial underrepresentation of Asian–Americans in the venire.

¶ 29 Because there were no Asian–Americans in the 100–person venire, the comparative disparity was 100%—2.63 divided by 2.63 and then multiplied by 100. *Cf. Washington*, 186 P.3d at 602. Some courts have found that 72.98% and 75% comparative disparities do not show substantial underrepresentation. *See United States v. Weaver*, 267 F.3d 231, 243–44 (3d Cir. 2001); *United States v. Armsbury*, 408 F.Supp. 1130, 1139 (D.Or. 1976). But we have found no court that has upheld a comparative disparity of 100% where such analysis was appropriately applied. As noted, however, our supreme court has cautioned against relying on comparative disparity with small groups because it tends to overstate underrepresentation and could lead to incongruous conclusions. *See Washington*, 186 P.3d at 603–04. The "smaller the group is, the more the comparative disparity figure distorts the proportional representation." *Shinault*, 147 F.3d at 1273 (citation omitted).[5] Indeed, the Tenth Circuit has recognized that, where particular groups each make up only 1.27%, 5.11%, and 2.92% of the voting age population, "it is not surprising that the comparative disparity numbers are large." *Id.*

¶ 30 With the absolute and comparative disparities pointing to different conclusions, we turn to absolute impact. The absolute impact here was 2.63: the absolute disparity (2.63%) multiplied by the number of potential jurors in the venire (100). *Cf. Washington*, 186 P.3d at 602. This means that approximately three Asian–Americans would have to be added to the jury array of 100 people in order to eliminate any underrepresentation.

*Cf. id.* at 603–04. In *State v. Gibbs*, 254 Conn. 578, 758 A.2d 327, 337 (2000)—which our supreme court discussed favorably in *Washington*—the Connecticut Supreme Court "reasoned that absolute impact was the proper statistical measure to use in that particular case because the distinctive group comprised a small percentage of the community's population." *Washington*, 186 P.3d at 604. *Gibbs* explained that absolute impact "measures underrepresentation in terms of its impact on juries, not simply percentages in the abstract. This analysis allows the courts to reject challenges when the challenged practices did not significantly alter the composition of the typical grand or petit jury." *Id.* (quoting *Gibbs*, 758 A.2d at 337).

¶ 31 The *Gibbs* court found an absolute impact of 2.36 to be a "slight underrepresentation" rather than a "gross or marked" disparity; thus, the absolute impact "simply fail[ed] to rise to the level of a constitutional violation." *Gibbs*, 758 A.2d at 337–38 (Hispanics comprised 6.7% of the population but only 4.21% of those responding to jury summonses) (citation omitted). *Gibbs* also cited other cases in which courts concluded that similar sizes of absolute impact did not show a constitutional violation. *See id.* As in *Gibbs* and its collected cases, the absolute impact of 2.63 here did not suggest a gross underrepresentation of Asian–Americans in the venire.

¶ 32 In sum, two of the three statistical models allegedly available to Luong's trial counsel—including the model arguably most suitable to small populations—did *not* suggest that the absence of Asian–Americans on the 100–person venire violated the Constitution.[6] As a result, we do not conclude that

5. "For example, in an area that had at least 500,000 whites and only one black eligible to serve as jurors, a random selection system that failed to place the single black on the master wheel would produce a 100 per cent comparative disparity, even though an all-white jury would clearly form a 'fair cross section' of the community." *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998) (citation omitted).

6. The record does not contain the data necessary to calculate "statistical significance," the fourth measurement mentioned in *Washington*. *See* 186 P.3d at 603. And Luong neither alleged that his trial counsel had such data nor relied on

statistical significance in his postconviction motion. Furthermore, by evaluating the information available to Luong's trial counsel, we do not suggest that a defendant can establish a Sixth Amendment fair cross-section violation merely by showing a group's underrepresentation on a jury venire in one case. As explained, the systematic exclusion must occur over a period of time, not only on one occasion. *Id.* at 601. Our focus on the information known to Luong's trial counsel reflects the unusual posture of Luong's claim (i.e., his counsel performed deficiently by failing to raise a fair cross-section claim at trial).

counsel's alleged failure to investigate a fair cross-section claim or equal protection claim constituted "errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Carmichael v. People*, 206 P.3d 800, 806 (Colo. 2009) (citation omitted); *see Ardolino*, 69 P.3d at 78 (Courts must consider whether "reasonable professional judgments supported the limitations counsel placed on his investigation."); *People v. Garner*, 2015 COA 174, ¶ 71, —— P.3d —— (concluding that the defendant failed to show deficient performance because "we perceive possible reasonable strategic grounds" for his counsel's decision).

¶ 33 Because Luong's factual allegations, accepted as true, did not show constitutionally deficient performance on the part of his trial counsel, we need not consider the prejudice prong of *Strickland*. *See Vieyra*, 169 P.3d at 209.

## III. Motion to Remand

¶ 34 As noted, Luong alleged in his postconviction motion that the State had destroyed the records of the relevant jury wheel and jury pool. Thus, he did not present such records, or arguments based on those records, in his postconviction motion. After he filed this appeal, however, he was informed that the records had not been destroyed.[7] He requests a remand to allow him to gather, examine, and present such records in a postconviction hearing.

¶ 35 But Luong acknowledges that these additional records could be relevant only to establishing the prejudice prong of the *Strickland* test (i.e., to prove that further investigation by his trial counsel would have uncovered a meritorious challenge to a jury selection method). Because we have concluded that his ineffective-assistance claim does not satisfy the deficient performance prong of *Strickland*, however, a remand for consideration of prejudice is unnecessary. Therefore, we deny the motion to remand.

7. In his postconviction motion, Luong appeared to challenge the constitutionality of section 13–71–138, C.R.S. 2015, which requires the state court administrator to preserve juror records for

## IV. Conclusion

¶ 36 The order is affirmed.

JUDGE TERRY and JUDGE FREYRE concur.

2016 COA 56M

three years. On appeal, Luong concedes that the subsequent discovery of the juror records "rendered moot" his challenge to the statute and the purported destruction of the records.