23CA1463 Peo v Baca 02-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1463
Jefferson County District Court No. 15CR915
Honorable Jeffrey R. Pilkinton, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Pedro Baca,

Defendant-Appellant.

---

ORDER AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 26, 2026

---

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Rachel C. Funez, Alternate Defense Counsel, Glenwood Springs, Colorado, for Defendant-Appellant

¶ 1     Defendant, Pedro Baca, appeals the district court's order summarily denying his petition for postconviction relief. We affirm.

## I.     Background

¶ 2     In September 2014, Baca (then fifty-four years old) was selling vacuums outside his apartment and asked J.M., an eleven-year-old girl, to help him move them to a storage closet in the building. *People v. Baca,* slip op. at ¶ 2 (Colo. App. No. 16CA1625, Dec. 12, 2019) (not published pursuant to C.A.R. 35(e)). Evidence at trial established that Baca touched J.M.'s breasts, shoulders, and chest, grabbed her neck, and pressed or rubbed his groin against her backside. There was also evidence that Baca later pushed J.M. onto a curb outside and put his hand between her legs. J.M. testified that Baca left when J.M.'s friend, V.B., approached.

¶ 3     J.M.'s mother, R.M., testified that after the incident J.M. was crying and extremely upset. Eventually, J.M. was calm enough to relay the incident to R.M., who called the police. When police spoke to Baca, he admitted he tickled J.M., hugged her from behind, and touched her neck. At trial, Baca similarly testified that he touched J.M.'s shoulder, hugged her, and tickled her waist.

¶ 4    In 2016, Baca was convicted of one count of sexual assault on a child by application of force, § 18-3-405(1), (2)(a), C.R.S. 2025. He received an indeterminate sentence of eleven years to life. He appealed, and a division of this court affirmed his conviction. *People v. Baca*, No. 16CA1625, slip op. at ¶ 16. Baca then unsuccessfully moved for reconsideration of his sentence.

¶ 5    Baca then filed a pro se petition for postconviction relief under Crim. P. 35(c), which counsel later supplemented. The postconviction court denied the petition, as supplemented, without a hearing. Baca now appeals, arguing that he was entitled to a hearing on his postconviction claims.

## II.    Standard of Review

¶ 6    We review the summary denial of postconviction relief de novo. *People v. Medina*, 2019 COA 103M, ¶ 4. We presume the legality of the judgment and the regularity of the postconviction proceeding. *Id.* A defendant seeking postconviction relief under Crim. P. 35(c) is entitled to a hearing "if he asserts specific facts that, if true, would provide a basis for relief." *People v. Luong*, 2016 COA 13M, ¶ 8. He is not entitled to a hearing "if the claim raises only an issue of law or if the allegations, even if true, do not provide a basis for relief."

2

*Id.* And a court may summarily deny postconviction relief when the allegations are "merely conclusory, vague, or lacking in detail." *Id.* (citation omitted).

### III. Ineffective Assistance of Counsel

¶ 7 In his petition for postconviction relief, Baca alleged ineffective assistance of counsel on several grounds. On appeal, he argues that the postconviction court erred by denying his claims without a hearing. We address and reject each argument in turn.

### A. Applicable Law

¶ 8 Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Houser*, 2020 COA 128, ¶ 27. To establish ineffective assistance, a defendant must show that "(1) counsel's performance was outside the wide range of professionally competent assistance and (2) the defendant was prejudiced by counsel's substandard legal work." *Id.* at ¶ 28 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We apply the same test to claims of ineffective appellate counsel. *Silva v. People*, 156 P.3d 1164, 1169 (Colo. 2007).

¶ 9 The first prong requires a showing "that counsel's representation fell below an objective standard of reasonableness."

*Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003). However, given the breadth of reasonable strategic choices, our scrutiny is highly deferential, and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Under the second prong, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Houser*, ¶ 30 (quoting *Strickland*, 466 U.S. at 694). A court may summarily deny a postconviction petition alleging ineffective assistance when "the defendant's allegations, even if proven true, would fail to establish either constitutionally deficient performance or prejudice." *Id.* at ¶ 42 (citation omitted).

### B. Failure to Present and Investigate DNA Evidence

¶ 10 Baca first contends that the court erred by summarily denying the claim that his counsel provided ineffective assistance by failing to pursue possibly exculpatory DNA evidence from the sweatshirt J.M. wore during the incident. Baca contends that DNA testing would have shown he touched J.M. only on her shoulders and waist, not her breasts. He argues that counsel failed to (1) request

DNA testing; (2) investigate the case; (3) consult with a DNA expert; and (4) present expert DNA testimony.

¶ 11    The postconviction court held that counsel's decision not to pursue DNA testing was reasonable because (1) the prosecution did not present DNA evidence, so there was no evidence to rebut; (2) Baca admitted he touched J.M., so his DNA would likely be on her clothing; and (3) DNA evidence would not explain the red marks that J.M.'s mother observed on J.M.'s chest.

¶ 12    We conclude that, even if true, Baca's allegations do not provide a basis for relief. *Luong*, ¶ 8. Even if testing would not have revealed DNA on the breast area of J.M.'s sweatshirt, defense counsel could have reasonably concluded that DNA evidence would not have been exculpatory. First, a lack of DNA would not have conclusively proved that Baca did not touch J.M.'s breasts. *See Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (explaining that DNA testing would not necessarily be exculpatory where the results could be inconclusive or incriminating). For example, a detective involved in the case testified that her understanding was that DNA evidence from someone touching a surface "would not likely be definitive or effective on fabrics that are similar to the hoodie." *See*

5

*People v. Hood*, 2024 COA 27, ¶ 27 (discussing expert testimony that "'touch DNA' is left behind when a person touches a surface, and whether and how much DNA is detected depends on the texture of the surface, how long the contact was, and whether the person sheds more DNA than others").

¶ 13    Baca's argument that testing would not reveal his DNA on the breast area of J.M.'s sweatshirt is also speculative. *See People v. Aguilar*, 2012 COA 181, ¶ 12 (concluding that a defendant was not entitled to a hearing on a speculative claim that a DNA expert could have contradicted certain evidence). For one, Baca admitted to hugging J.M., so his DNA could have transferred to the breast area of the sweatshirt even if he did not touch her breasts. *See Hood,* ¶ 27; *People v. Ortega*, 2016 COA 148, ¶¶ 32-33 (describing expert testimony that touch DNA can be transferred from one surface to another, and "DNA analysis could not conclusively establish how DNA arrived on a piece of clothing").

¶ 14    And if testing showed DNA on the breast area of J.M.'s sweatshirt, such evidence would likely be incriminating. Counsel could have chosen not to pursue testing for this reason. *See Cummings v. Sirmons*, 506 F.3d 1211, 1222 n.2 (10th Cir. 2007)

(concluding that counsel performed adequately by not requesting DNA testing because "[h]ad the DNA testing indicated a link to Cummings, such evidence would clearly have been damaging"). Indeed, the record suggests that counsel chose this strategy by emphasizing the lack of DNA evidence and the fact that police did not request DNA testing: "So no request was ever done to determine if there was DNA across this area that [J.M.] described extensive touching of?" *See People v. Wardell*, 2020 COA 47, ¶ 29 (ineffective assistance involves errors "so flagrant that they more likely resulted from neglect or ignorance rather than from informed professional deliberation").

¶ 15     Although Baca suggests that a hearing is necessary to determine whether his counsel's choice was reasonable, the record shows that counsel did not simply forget about DNA evidence but made a tactical decision not to present it. *See People v. Phipps*, 2016 COA 190M, ¶ 19 (summary denial of a postconviction motion is appropriate "if the record directly refutes the defendant's claims"); *Ardolino*, 69 P.3d at 76 ("Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable . . . .").

¶ 16    Therefore, we agree with the postconviction court that Baca failed to allege facts that, if true, would establish that his counsel performed deficiently by failing to request DNA testing. *See Houser*, ¶ 42. Moreover, even assuming counsel performed deficiently *and* that DNA testing would have yielded the results Baca claims, he still cannot show a reasonable probability that the result of his trial would have been different but for counsel's errors. *See id.* at ¶ 30. For example, the absence (or inconclusive nature) of DNA evidence could have been explained by nonexculpatory causes such as the fabric's material or the presence of other DNA on the sweatshirt. And even without DNA evidence that Baca touched J.M.'s breasts, the jury heard testimony that he touched her breasts and rubbed his groin against her backside.

¶ 17    Baca next contends that the postconviction court erred by overlooking his argument that counsel performed deficiently by "fail[ing] to sufficiently investigate or even consult with a DNA expert to find out if the DNA evidence would have been helpful." As for the failure to investigate argument, Baca does not articulate *what* counsel should have investigated beyond consulting with a DNA expert, which he frames as a separate argument. His

8

postconviction petition similarly lacked detail on this point. Thus, this argument was "conclusory, vague, or lacking in detail" and did not warrant relief. *Luong*, ¶ 8 (citation omitted); *see also People v. Washington*, 2014 COA 41, ¶ 46 (a court's "failure to make findings of fact and to state conclusions of law is harmless" if it properly denies a Crim. P. 35(c) motion).

¶ 18     We also reject Baca's argument that the postconviction court erred by not considering his claim that counsel was ineffective for not consulting with a DNA expert. *See Aguilar*, ¶ 12 ("[The] defendant failed to alleged facts establishing that counsel's choice [to not call a rebuttal DNA expert] was outside the wide range of professionally competent assistance."). We see little difference between this argument and the argument that counsel should have requested DNA testing. Consulting with an expert could have potentially revealed, for example, that the sweatshirt's material would make DNA testing difficult or that testing could suggest where Baca touched J.M. But the consultation could not have conclusively established that Baca did not touch J.M.'s breasts. The postconviction court could have reasonably concluded that it implicitly addressed the expert consultation argument when it

determined that counsel's failure to request DNA testing did not warrant a hearing. In any case, we may affirm on any basis supported by the record. *People v. Taylor*, 2018 COA 175, ¶ 8.

¶ 19 Finally, Baca contends that the court failed to address his argument about counsel's failure to present expert testimony that DNA evidence could have established where J.M. was touched. But Baca's petition did not develop this argument; he merely asserted that "[e]xpert testimony to say the prosecution could have found physical evidence, if it was there, if they had looked, would have been very helpful to the defense." Therefore, had the court addressed this argument, it would not have warranted a hearing because it was conclusory and lacked detail. *Luong*, ¶ 8; *see Washington*, ¶ 46.

¶ 20 In sum, we conclude that Baca's claims regarding the DNA evidence in his petition for postconviction relief did not raise "facts that, if true, would provide a basis for relief" such that he was entitled to a hearing on these claims. *Luong*, ¶ 8.

## C. Failure to Call V.B. as a Witness

¶ 21 Baca next asserts that he was entitled to a hearing on his claim that his counsel performed deficiently by failing to call V.B. —

10

J.M.'s friend — as a witness. According to Baca, V.B. would have testified that J.M. never mentioned any sexual touching and that V.B. did not see J.M. and Baca sitting on the curb. V.B. was originally subpoenaed to testify, but she was not subpoenaed again after the trial was continued. Baca argued that, although a detective testified about V.B.'s statements to police — including that J.M. did not report sexual touching to V.B. — this was less effective than V.B.'s direct testimony. The postconviction court disagreed, concluding that there was no dispute about who witnessed the crime and that further testimony would have been cumulative and "could have opened the door to" potentially harmful inconsistencies.

¶ 22    First, as to Baca's argument that J.M. did not report any sexual touching to V.B., we agree with the postconviction court that this testimony would have been cumulative. Detective Faith Stevens testified that V.B. said J.M. did not mention Baca "push[ing] his front part into the back of her" and that J.M. "never told [V.B.] that [Baca] touched [J.M.] on her hips, chest, or bottom area." This contradicted J.M.'s testimony that she told V.B. that Baca touched her chest.

¶ 23    Stevens' testimony revealed other inconsistencies between J.M.'s testimony and V.B.'s statements to police. For example, Stevens testified to V.B.'s statement that J.M. said Baca pushed her against a wall, grabbed her, and would not let go. But J.M. testified that she did not remember telling V.B. this. V.B.'s testimony would have been cumulative of Stevens' and potentially less persuasive. *See Washington*, ¶ 35 (counsel's failure to present cumulative evidence was not constitutionally ineffective). Stevens' testimony was based on interview notes made days after the incident; V.B. would have testified from memory about an incident that occurred two years prior.

¶ 24    Finally, Baca argues that V.B. would have testified that she saw J.M. running out of the building after the incident, while J.M. testified that V.B. walked up to her and Baca sitting on the curb. Baca asserts that V.B.'s testimony that she did not see Baca sitting on the curb or touching J.M.'s leg would have undermined J.M.'s credibility. But it was undisputed that V.B. encountered J.M. shortly after the assault, and we disagree that the different recollections would have cast so much doubt on J.M.'s credibility as

to undermine her testimony about Baca's sexual touching in the storage closet.

¶ 25    Additionally, V.B. disclosed other potentially incriminating information to Stevens. For example, V.B. told Stevens that J.M. said "she 'could have been raped'" and generally described J.M.'s fear and emotion after the incident. V.B. also told Stevens that Baca once "'grabbed [V.B.] by the waist' in an attempt to joke and scare her." Stevens did not testify to these statements, and Baca's counsel could have reasonably concluded that calling V.B. as a witness risked revealing potentially harmful evidence. *See People v. Bergerud*, 223 P.3d 686, 704 (Colo. 2010) ("The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess." (quoting *Greiner v. Wells*, 417 F. 3d 305, 323 (2d Cir. 2005))).

¶ 26    Because Baca failed to allege facts establishing that counsel's failure to call V.B. was deficient performance, he was not entitled to a hearing on this claim. *See Houser*, ¶¶ 28, 42.

### D.    Failure to Call Baca's Family Members as Witnesses

¶ 27    Baca next contends that the postconviction court erred by summarily denying his claim that defense counsel acted

13

unreasonably by failing to call certain members of his family as witnesses. He argues that they could have testified that he had a reputation for helpfulness and had shown nonsexual affection toward other children. The court held that this evidence would have been cumulative of R.M.'s testimony that Baca had been helpful and that she "considered him to be a nice guy." We agree, and we also agree with the court's reasoning that Baca's "reputation for helpfulness does not render him incapable of sexual assault."

¶ 28 Baca also argues that counsel should have called his sister, M.B., as a witness. On the day of the incident, M.B. apparently called her mother to say she was picking Baca up and arrived at Baca's apartment approximately ten minutes later but saw no one outside. Baca contends that this testimony would have established a timeline, "leaving very little time for Baca to assault J.M." But his petition did not indicate when the phone call occurred, when M.B. arrived, or how that timeline related to the assault. So this argument was conclusory and lacked supporting detail. *Luong*, ¶ 8.

¶ 29 Overall, Baca failed to allege facts that, if true, would establish that counsel was ineffective for failing to call his family members as

witnesses.  *See Houser*, ¶¶ 28, 42.  Having so concluded, we need not address the claimed prejudice.  *Id.* at ¶¶ 28, 30.

E.     Failure to Object to Violations of a Sequestration Order

¶ 30     Baca next argues that he was entitled to a hearing on his claim that counsel failed to object to violations of a witness sequestration order.  He submitted several statements from people who alleged that witnesses were sitting together and speaking in the courtroom.  The postconviction court explained that "[n]either the parties, counsel, nor the court saw a violation of the sequestration order."

¶ 31     Although Baca contends that the court improperly relied on its own recollection, his petition admitted that "[d]efense counsel . . . state[d] that if she would have known of any violation of the sequestration order, she would have brought it to the court's attention."  Baca has not alleged any facts to suggest that counsel knew of any such violation.  *See Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1538 (10th Cir. 1994) (counsel is not ineffective for not objecting to something which she had no knowledge of).  Further, none of the statements alleging a violation of the sequestration order described the contents of the conversations between the

15

sequestered witnesses. So Baca has not alleged any facts suggesting he was prejudiced. *See Houser*, ¶¶ 28, 30. And his allegation that R.M. was "coaching" J.M. is speculative and conclusory. *See Luong*, ¶ 8.

### F. Failure to Challenge Sufficiency

¶ 32 Baca argues that his trial and appellate counsel were ineffective for failing to challenge the sufficiency of the evidence presented. At trial, defense counsel moved for a judgment of acquittal based on a lack of corroborating evidence and inconsistencies in the testimony. Baca's direct appeal did not raise a sufficiency argument and instead argued that the district court erred by failing to give a special unanimity jury instruction. *Baca*, No. 16CA1625, slip op. at ¶¶ 6-12. He also argued that a clerical mistake in the mittimus warranted correction. *Id.* at ¶ 13.

¶ 33 In his Crim. P. 35(c) petition, Baca contended that his trial and appellate counsel performed deficiently by failing to argue that the prosecution did not prove all the elements of the charged crime beyond a reasonable doubt. At trial, the prosecution had to prove that Baca "applie[d] force against the victim in order to accomplish or facilitate sexual contact." § 18-3-405(2)(a). Sexual contact is

16

"[t]he knowing touching of the victim's intimate parts . . . or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for *the purposes of sexual arousal, gratification, or abuse.*" § 18-3-401(4)(a), C.R.S. 2025 (emphasis added). Baca contends that the prosecution did not prove the sexual purpose element of sexual contact. He argues that trial and appellate counsel were ineffective for not raising this argument and that the postconviction court erred by summarily denying this contention.

¶ 34 Baca's petition argued that there was insufficient evidence of sexual purpose because there was no evidence that he made sexual statements or sounds, nor did he tell J.M. not to discuss what happened or try to prevent her from speaking to friends or family. He relied on *People in Interest of J.O.*, 2022 COA 65M, ¶¶ 1-2, which considered whether evidence was sufficient to conclude that a *juvenile* acted with a sexual purpose. The division held that juveniles (there, an eleven-year-old) can act with a sexual purpose, but evidence beyond the sexual contact itself is required. *Id.* at ¶ 29. Such evidence could include "removing clothing, heavy breathing, placing the victim's hand on the accused's genitals, an

erection, other observable signs of arousal, the relationship of the parties, sexually explicit comments, coercing or deceiving the victim to obtain cooperation, attempting to avoid detection, or instructing the victim not to disclose the occurrence." *Id.*

¶ 35 In rejecting Baca's argument, the postconviction court distinguished the eleven-year-old defendant in *J.O.* from the adult Baca and cited the division's conclusion that "[i]t may not — and often will not — be appropriate for a fact finder to ascribe the same intent to a juvenile's act that one could reasonably ascribe to the same act if performed by an adult." *Id.* at ¶ 28. We agree. Not only is *J.O.* distinguishable on this basis, but it was also decided after Baca's trial and direct appeal. *See Houser,* ¶ 33 ("[A] lawyer does not perform deficiently by 'failing to raise novel arguments that are unsupported by then-existing precedent.'" (citation omitted)).

¶ 36 Moreover, while *J.O.* was decided after Baca's trial and direct appeal, we do not see why he could not have argued in his direct appeal that his trial counsel was ineffective for failing to argue insufficient evidence of a sexual purpose. *See* Crim. P. 35(c)(3)(VII) (prohibiting most arguments that could have been brought on direct appeal). *J.O.* was not the first case to consider a sufficiency

challenge to the sexual purpose element of sexual contact. *E.g.,* *People v. West*, 724 P.2d 623, 627-28, 630 (Colo. 1986).

¶ 37　But even assuming Baca properly presented the argument that his trial counsel performed deficiently, there was circumstantial evidence of a sexual purpose. *See J.O.,* ¶ 20 (Intent is often "inferred from the nature of and the circumstances surrounding the sexual touching."). For example, there was evidence that most of the sexual touching (including Baca rubbing his groin against J.M.) occurred in private. *See id.* at ¶ 29 (attempt to avoid detection may be evidence of a sexual purpose). Baca also told police he believed they were contacting him "in reference to touching or harassing somebody" named J.M.

¶ 38　And, as discussed, evidence of sexual intent is not the same for adults and juveniles. *Id.* at ¶¶ 25, 28. For example, in *West*, witnesses testified that an adult defendant put his hands over the part of a child victim's clothing that covered "his intimate parts," and the touching "appeared to be deliberate and not accidental." 724 P.2d at 631. The supreme court rejected an argument that this was insufficient "to establish that the touching was for the purpose of sexual arousal, gratification, or abuse." *Id.* at 630. Here, there

was evidence from which the jury could have inferred that Baca touched J.M.'s breasts and rubbed his groin against her for a sexual purpose.

¶ 39     Therefore, Baca failed to establish that his intent argument was "clearly stronger than those presented" at trial and on appeal such that "the presumption of effective assistance of counsel [may] be overcome." *People v. Huggins*, 2019 COA 116, ¶ 48 (citation omitted).  Accordingly, the postconviction court properly denied this portion of Baca's petition without a hearing.  *See Luong*, ¶ 8.

IV.     The Postconviction Court's Failure to Address Arguments

¶ 40     Baca next asserts that the postconviction court erred by not addressing several of his arguments, including that trial counsel failed to (1) properly investigate; (2) consult a DNA expert and present expert testimony; (3) present a recorded 911 call that did not disclose sexual touching; and (4) present a hospital examination report from the night of the incident, which did not mention marks on J.M.'s neck or sexual touching.

¶ 41     Although a court must enter findings of fact and conclusions of law when denying a Crim. P. 35(c) motion, failure to do so is harmless if the court properly denies relief.  *Washington*, ¶ 46.

20

Because the postconviction court properly denied Baca's motion, its failure to address some of his arguments was harmless.

¶ 42     We addressed Baca's arguments about the DNA evidence *supra* Part III.B.  Regarding Baca's argument about counsel's failure to investigate the case, he cited a portion of his pro se petition that described certain evidence presented at trial, but he did not discuss counsel's failure to investigate with any particular detail beyond stating that counsel failed to "call critical witnesses, present exculpatory evidence, and otherwise challenge the prosecution's case-in-chief."  This argument is vague and unsupported, and it overlaps with several of Baca's other arguments.  So even if the court should have addressed this argument, Baca was not entitled to a hearing.  *See id.*; *Taylor*, ¶ 8.

¶ 43     Similarly, because Baca's arguments about the 911 call and the hospital report would not have entitled him to a hearing, we conclude that any error in the postconviction court's failure to address them was harmless.  *See Washington*, ¶ 46.  First, we agree with the State that the 911 call would have been cumulative of evidence from R.M. and the 911 operator, who both testified that R.M. did not report sexual touching in the 911 call.  *See id.* at ¶ 35

(counsel is not constitutionally ineffective for failing to obtain and present cumulative evidence). Similarly, the hospital report would have been cumulative of evidence that J.M. did not initially report sexual touching and of an officer's testimony that he did not observe any injuries or visible marks on J.M. after the assault.

¶ 44     Moreover, defense counsel moved to suppress evidence of J.M.'s hospital visit, arguing that it was cumulative and prejudicial. The district court agreed, explaining that it could create unfair sympathy and confuse the issues. It seems that counsel strategically chose not to introduce evidence of the hospital visit, including the examination report, to avoid potential prejudice. *See Ardolino*, 69 P.3d at 76 (Counsel's informed strategic choices "are virtually unchallengeable."). Thus, any error in failing to address Baca's argument regarding the hospital report was harmless. *Washington*, ¶ 46.

## V.     Proportionality

¶ 45     Lastly, we consider and reject Baca's argument that his sentence was unconstitutionally disproportionate.

## A.  Standard of Review and Applicable Law

¶ 46     Whether a sentence is unconstitutionally disproportionate is a question of law that we review de novo.  *Wells-Yates v. People*, 2019 CO 90M, ¶ 35.  The Eighth Amendment prohibits sentences that are grossly disproportionate to the severity of the crime committed.  *People v. Duran*, 2025 COA 34, ¶ 27.  But strict proportionality is not required; the Constitution prohibits "only extreme sentences that are grossly disproportionate to the crime."  *Id.*  Our supreme court has explained that sentences in noncapital cases are rarely grossly disproportionate.  *Rutter v. People*, 2015 CO 71, ¶ 16.

¶ 47     Under Colorado's "abbreviated proportionality review," we first "compare[] the gravity and seriousness of the offense with the harshness of the penalty."  *Duran*, ¶ 28.  However, if a crime is per se gave and serious for proportionality purposes, we do not address gravity or seriousness and begin with the penalty's harshness.  *Id.* at ¶ 30.  If the abbreviated review "gives rise to an inference of gross disproportionality," we conduct an extended review.  *Id.* at ¶ 28.

¶ 48     When considering a penalty's harshness, we give considerable deference to the legislature's sentencing scheme.  *Id.* at ¶ 31; *People v. Oglethorpe*, 87 P.3d 129, 135 (Colo. App. 2003).  To assess

23

harshness, we consider "the sentence's length and the defendant's parole eligibility."  *Duran*, ¶ 31.

## B.    Application

¶ 49    Because sexual assault on a child is a per se grave and serious offense,[1] *People v. Strean*, 74 P.3d 387, 396 (Colo. App. 2002), we begin by considering the harshness of Baca's sentence. *Duran*, ¶ 30.  Our analysis continues only if there is an inference of gross disproportionality.  *Duran*, ¶ 28.

¶ 50    Sexual assault on a child by application of force is a class 3 felony.  § 18-3-405(1), (2)(a).  As mentioned, Baca received an indeterminate sentence of eleven years to life.  *See Chavez v. People*, 2015 CO 62, ¶ 11 (explaining the indeterminate sentencing scheme for sex offenders); § 18-1.3-1004(1), C.R.S. 2025.  The presumptive sentencing range for class 3 felonies is a minimum of four years and a maximum of twelve years.  § 18-1.3-401(1)(a)(V)(A), C.R.S. 2025.  However, the "force" component of Baca's conviction elevated it to a crime of violence.  *See* § 18-3-405(3); § 18-1.3-406, C.R.S. 2025.  Sex offenses that constitute crimes of violence are subject to

---

[1] Baca does not appear to dispute that sexual assault on a child is a per se grave and serious offense.

an indeterminate sentencing range of "at least the midpoint in the presumptive range . . . and a maximum of the sex offender's natural life." § 18-1.3-1004(1)(b).

¶ 51 "[A] court imposing an indeterminate sentence will arrive at a sentence of some minimum number of years to life." *Chavez*, ¶ 11. For a sex offense that is also a crime of violence, a court must "impose[] an indeterminate sentence with a maximum term of the offender's natural life, but the crime-of-violence enhancement boosts the minimum term." *Id.* at ¶ 15. Considering a sex offense that was a class 3 felony and a crime of violence, the *Chavez* court concluded that the indeterminate sentence's minimum range was between eight and twenty-four years. *Id.* at ¶ 23; *see People v. Hunsaker*, 2013 COA 5, ¶ 39 ("[T]he bottom end of an indeterminate sentence for a sex offense that is also a crime of violence is . . . between the midpoint in, and twice the maximum of, the presumptive range for the applicable felony class."), *aff'd*, 2015 CO 46.

¶ 52 The same ranges apply here, so the court "was required to sentence [Baca] to a minimum term of between eight and twenty-four years and a maximum term of his life." *Chavez*, ¶¶ 2, 23.

25

Baca primarily argues that his sentence was disproportionate because his maximum possible sentence is the remainder of his life. But because his sentence is indeterminate, he is eligible for parole (subject to the parole board's discretion) after serving the minimum range (eleven years) less credit for time served (144 days). *See Godinez v. Williams*, 2024 CO 14, ¶ 24 (citing § 18-1.3-1006(1)(a), C.R.S. 2025). This undermines Baca's argument that he received a life sentence. *See Wells-Yates*, ¶ 14 (Parole eligibility can "render the penalty less harsh.").

¶ 53 Our supreme court has also repeatedly explained that the statutory scheme mandates a maximum indeterminate sentence of "the sex offender's natural life." *E.g., Godinez*, ¶ 24; *Chavez*, ¶ 11. And Colorado courts have repeatedly rejected constitutional challenges to this indeterminate sentencing scheme. *E.g., People v. White*, 656 P.2d 690, 695 (Colo. 1983) (holding that indeterminate sentencing for sex offenders is not unconstitutional); *Oglethorpe*, 87 P.3d at 135 (rejecting a proportionality challenge to a potential life sentence imposed via indeterminate sentencing); *People v. Dash*, 104 P.3d 286, 288, 293 (Colo. App. 2004) (rejecting an Eighth Amendment challenge to an indeterminate sentence of five years to

life). We therefore conclude that the postconviction court did not err by rejecting Baca's argument that the maximum range of his indeterminate sentence was grossly disproportionate.

¶ 54 To the extent that Baca challenges the eleven-year minimum range of his indeterminate sentence, we similarly reject his arguments. It is extremely rare "for a sentence to be deemed so extreme that it is grossly disproportionate." *Wells-Yates,* ¶ 5. The postconviction court explained that Baca's sentence was on the lower end of the presumptive minimum range and was "a significant sentence reflective of a significant crime." "[I]f a crime is grave or serious, and so long as the penalty is within the statutory range, the sentence is nearly impervious to attack." *People v. Kennedy,* 2023 COA 83M, ¶ 15, *aff'd,* 2025 CO 63. Because Baca's sentence "fell within the presumptive range[,] . . . the sentence is not grossly disproportionate." *People v. Thomeczek,* 284 P.3d 110, 117-18 (Colo. App. 2011) (affirming a twelve-year sentence with a presumptive range of four to twelve years); *see also People v. Hall,* 87 P.3d 210, 212 (Colo. App. 2003) (affirming an eight-year sentence with a presumptive range of two to eight years).

¶ 55    In sum, the harshness of Baca's sentence did not give rise to an inference of gross proportionality, and the postconviction court properly denied Baca's request for a hearing on his proportionality claim. *See Duran*, ¶¶ 28, 30; *see also Luong*, ¶ 8 (summary denial is appropriate for issues of law).

## VI.    Disposition

¶ 56    The postconviction court's order is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.